UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MICHAEL W. WEBB,                                    Civil No. 06-3491 (MJD/FLN)

                    Plaintiff,

v.

MICHAEL J. ASTRUE,                          **REPORT AND RECOMMENDATION**
Commissioner of Social Security,

                    Defendant.

_____

Daniel S. Rethmeier, Esq., for Plaintiff .
Lonnie F. Bryan, Assistant United States Attorney, for the Government.

_____

Plaintiff Michael Webb seeks judicial review of the final decision of the Commissioner of

Social Security ("Commissioner"), who denied his application for disability insurance benefits

("DIB").  See 42 U.S.C. § 1382 (c).  This Court has appellate jurisdiction over the claim pursuant

to 42 U.S.C. §§ 405 (g).  The matter was referred to the undersigned United States Magistrate Judge

for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c).  The parties

have submitted cross-motions for summary judgment [## 12, 22].  For the reasons set forth below,

it is the Court's recommendation that the Commissioner's decision be affirmed.

## I. INTRODUCTION

Plaintiff applied for DIB on July 21, 2003, alleging he became disabled on May 10, 2003.

(Tr. 105.)  On July 31, 2003, Plaintiff amended his date of onset to April 1, 2003.  (Tr. 108.)   His

alleged impairments are diabetes, peripheral neuropathy in his lower extremities, autonomic

neuropathy with bloating and constitipation, pain, and  blurry vision.  (Tr. 122, 156.)  The Social

Security Administration denied the application initially and upon reconsideration.  (Tr. 76-82, 88-

89.)  Plaintiff filed a timely request for a hearing, which was held before Administrative Law Judge ("ALJ") Mary M. Kunz on January 19, 2005.  (Tr. 31-75, 91, 99-103.)  Plaintiff was represented by counsel, testified on his own behalf, and called his wife to testify on his behalf.  (Tr. 33-60.)  A medical expert ("ME"), Dr. Andrew Steiner, and a vocational expert ("VE"), Wayne Onken, also testified.  (Tr. 61-74, 97-98.)   The ALJ rendered an unfavorable decision dated April 4, 2005.  (Tr. 19-29.)   The ALJ determined that Plaintiff's residual functional capacity ("RFC") prevented him from performing his past relevant work, but concluded Plaintiff could perform a significant number of jobs in the national economy.  (Tr. 28.) On April 11, 2005, Plaintiff appealed that unfavorable decision to the Appeals Council.  (Tr. 14-15.)  The Appeals Council denied the request for review on July 6, 2006, making the decision of the ALJ the final decision of the Commissioner.  (Tr. 8-10.)

Plaintiff initiated this action in federal court seeking judicial review on August 28, 2006. (Docket No. 1.)  He moved for summary judgment May 30, 2007.  (Docket No. 12.)  Plaintiff raises four issues in his motion: (1) whether the Plaintiff's combination of impairments is medically equal to a listed impairment; (2)  whether the ALJ properly weighed the opinions of treating and examining physicians in determining Plaintiff's RFC; (3) whether the ALJ properly analyzed the credibility of  Plaintiff's subjective complaints of pain and (4) whether the ALJ offered the VE a valid and complete hypothetical.  The Commissioner filed his motion for summary judgment on July 26, 2007. (Docket No. 22.)  We recommend the decision of the ALJ be affirmed as supported by substantial evidence on the record as a whole.

## II.  STATEMENT OF FACTS

### A.     Background

Plaintiff was born on October 27, 1958, and was forty-six years old at the time of the ALJ's decision. (Tr. 105.)  Plaintiff graduated from high school in 1975. (Tr. 128)  Plaintiff served in the United States Air Force from 1975 to 1997. (Tr. 142.)   Following his service in the Air Force, Plaintiff maintained continuous and consistent employment as a hotel utilities porter, bus driver and fork lift driver. (Tr. 142, 181.)  His last full-time employment was as a fork lift driver and ended in June 2002. (Tr. 142, 181.)  From October 2002 to April 2003, Plaintiff worked approximately eight hours a week performing quality control duties for a telemarketing company; this employment ended because it did not provide enough hours. (Tr. 132.)  On May 14, 2003, Plaintiff began work as a fork lift driver; this employment only lasted two days due to his medical condition. (Tr. 132.)

### B.     Medical Evidence

Plaintiff's primary care physician is Dr. David Bue. (Tr. 319-52.)   On December 23, 2002, Dr. Bue examined Plaintiff due to testicular pain and frequent urination. (Tr. 340.)  A urinalysis was performed that revealed a high level of glucose in his urine. (Tr. 340.)  Due to this result, Dr. Bue ordered a fasting glucose test to be performed on the next day. (Tr. 340.)  The fasting glucose test produced abnormal results. (Tr. 342.)  As a result of the abnormal results, Dr. Bue referred Plaintiff to diabetes education and Plaintiff attended the education course on January 6, 2003. (Tr. 337-39.)

On February 19, 2003, Plaintiff visited the walk-in clinic at Dr. Bue's offices. (Tr. 335.)  Plaintiff complained of constipation, bloating and pain in his right flank. (Tr. 335.)  Plaintiff was diagnosed with constipation and directed to take a Fleet's enema, metamucil, maalox and mylanta. (Tr. 336.)

3

From June 13, 2003, to September 16, 2003, Plaintiff was examined three times at the St. Cloud Foot and Ankle Center.  (Tr. 202.)  Plaintiff presented with burning, stabbing and sharp pains to both feet.  (Tr. 202.)  Plaintiff was diagnosed with diabetic neuropathy in both feet and prescribed Neurontin.  (Tr. 202.)  Plaintiff was also fitted with arch supports that could help his feet.  (Tr. 202.)

On July 10, 2003, Dr. Bue treated Plaintiff for diabetic neuritis, diabetes, and tobaccoism. (Tr. 331-32.)  In regards to diabetic neuritis, Plaintiff complained of considerable difficulty in ambulating.  (Tr. 331.)  He reported that his taking Neurontin did not provide relief for the neuritis and caused constipation as a side effect.  (Tr. 331.)  Dr. Bue observed that the peripheral pulses in his extremities were somewhat diminished and he suffered hair loss on his legs.  (Tr. 331.)  During this visit, Dr. Bue strongly urged Plaintiff to cease tobacco use and offered various ceasation programs.  (Tr. 332.)  In conjunction with this visit, Dr. Bue wrote a letter stating that:

> Mr. Webb has type 2 diabetes and has developed a severe peripheral neuropathy as a result of that making it very difficult for him to walk and stand for any length of time and as a result it is very difficult for him to work on a regular basis.  I have thus advised him to apply for social security disability.

(Tr. 329.)

On July 23, 2003, a state agency physician assessed the Plaintiff's RFC.  (Tr. 204-211.)  The physician concluded that Plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently, stand for at least two hours in an eight-hour workday and sit for six hours in an eight-hour workday.  (Tr. 205.)  The physician indicated that Plaintiff should never climb a ladder, rope, or scaffold, but may occasionally climb a ramp or stairs.  (Tr. 206.)  The physician limited Plaintiff to occasionally balancing or crouching, but placed no limitation on kneeling or crawling.  (Tr. 206.) The examining physician concluded that the "alleged severity of symptoms is credible only to the extent of this sedentary RFC.  Pain is considered and contributes to finding [Plaintiff] restricted to

4

sedentary work." (Tr. 210.)  In reference to the statements of treating physicians, the examining physician noted that "[treating physician] notes it is difficult for [Plaintiff] to stand or walk for any length of time.  We agree and have limited [Plaintiff] to standing/walking only [two] of every [eight] hour in an average workday." (Tr. 210.)  The assessment was signed by Dr. Aaron Mark on August 15, 2003, and affirmed by Dr. Jacalyn A. Kawiecki on December 20, 2003.  (Tr. 211.)

On September 10, 2003, Plaintiff had a neurology consultation with Dr. Kevin Xie at the request of Dr. Bue.  (Tr. 293.)  Dr. Xie noted the Plaintiff's complaints of bilateral lower extremity pain and concluded that it is likely diffuse peripheral neuropathy caused by diabetes. (Tr. 294.)  Dr. Xie ordered a nerve conduction study, EMG test and ultrasound of Plaintiff legs.  (Tr. 294.)  During these tests, Plaintiff walked on a treadmill at 1.2 mph at a 10% grade for 1 minute and 20 seconds before stopping due to foot numbness and tiredness.  (Tr. 308.)  These tests led Dr. Xie to conclude that Plaintiff had a "very mild diffuse polyneuropathy." (Tr. 290.)  Dr. Xie referred Plaintiff for a surgical consultation with Dr. Stephen Sahlstrom.  (Tr. 289.)  Dr. Sahlstrom noted that Plaintiff's reports of equal pain in both legs is odd because the arterial flow into both legs is different.  (Tr. 289)  Dr. Sahlstrom recommended that Plaintiff wear knee-high support stockings and concluded that a need for a surgical procedure would be unlikely.  (Tr. 289.)

On September 18, 2003, Dr. Bue treated Plaintiff for bloating and constipation.  (Tr. 330.) Dr. Bue attributed his constipation to taking Nortriptyline for neuritis. (Tr. 330.)  Dr. Bue instructed Plaintiff to cease Nortriptyline and restart Neurontin.  (Tr. 330.)

On January 2, 2004, Dr. Bue treated Plaintiff for constipation.  (Tr. 320.)  Plaintiff had been seen at the emergency room for constipation two days prior to this visit.  (Tr. 287, 305, 320.)  During this visit, Dr. Bue noted that Plaintiff continued to suffer from peripheral neuritis.  (Tr. 320.) Dr. Bue

was unable to determine the cause of the constipation; he prescribed laxatives and scheduled Plaintiff for an abdominal CT on January 7, 2004.  (Tr. 320.)  The abdominal CT revealed no abnormalities other than a right inguinal hernia and vascular calcifications.  (Tr. 352.)

On January 9, 2004, Plaintiff went to the emergency room with abdominal discomfort.  (Tr. 217.)  The emergency room physician attributed the discomfort to constipation.  (Tr. 217.)  A soap suds enema was administered, which caused two large bowel movements and a marked improvement in the discomfort.  (Tr. 218.)  Plaintiff was discharged from the emergency room and approximately two hours later he returned to the emergency room with chest pain. (Tr. 219.) Plaintiff was admitted into the hospital for testing related to his chest pain.  (Tr. 220.)  During the physical examination,  the doctor noted that Plaintiff had "normal strength and sensation of lower extremities.  (Tr. 223.)  The doctors discharged Plaintiff on January 10, 2004, and attributed the chest pain to gastroesophageal reflux.  (Tr. 212.)

On March 3, 2004, Plaintiff sought treatment for abdominal pain.  (Tr. 365.)  Plaintiff complained of constipation and bloating.  (Tr. 365.)  Plaintiff's pain was relieved by morphine and Reglan. (Tr. 366.)  Plaintiff was discharged home with a referral to see a gastrointestinal specialist. (Tr. 366.)  On March 21, 2004, Plaintiff again sought treatment for chronic abdominal pain in the emergency room at St. Cloud Hospital.  (Tr. 362.)  Another CT scan was conducted that revealed no abnormalities.  (Tr. 363-64.)  Plaintiff was discharged and instructed to return to the emergency room if symptoms returned before he could see a gastrointestinal specialist.  (Tr. 363.)

On March 16, 2004, Plaintiff received a upper gastrointestinal endoscopy and colonoscopy upon the referral of Dr. Bue.  (Tr. 282-83.)  The results for all of these exams were normal.  (Tr. 282-83.)  Following these examinations, Plaintiff had a gastroenterological outreach consultation

with Dr. Paul Dorsher at the request of Dr. Bue.  (Tr. 278.)  Dr. Dorsher diagnosed Plaintiff with

diabetes with autonomic and peripheral neuropathy.  (Tr. 280.)  Dr. Dorsher concluded that the

autonomic neuropathy primarily affected his stomach and not his colon.  (Tr. 280.)  Dr. Dorsher

recommended controlling the autonomic neuropathy through diet and medication.  (Tr. 280.)

On April 3, 2004, Plaintiff returned to the emergency room with abdominal pain. (Tr. 358-

61.)  Plaintiff's condition improved after being treated with morphine and Reglan.  (Tr. 359.)  On

April 12, 2004, Dr. Bue examined Plaintiff regarding his diabetes and neuropathy.  (Tr. 376.)  In

support of Plaintiff's Social Security Claim, Dr. Bue wrote a letter stating Plaintiff's medical

problems as:

> includ[ing] complicated type II diabetes with rather marked peripheral neuralgia and
> neuritis and autonomic dysfunction of his GI tract.  The peripheral neuritis results in
> considerable pain in his legs and feet, making it quite difficult, and at times almost
> intolerable, for him to sit or stand for any length of time.  The autonomic neuropathy,
> a very difficult therapeutic problem, has resulted in persistent and recurring
> abdominal pain.  Both of these taken together make it very difficult for [Plaintiff] to
> perform even the most routine of work duties consistently and without distraction.
> The prognosis for these ailments is uncertain, but we would expect possibly that this
> condition would gradually progress over the coming years, making gainful and
> consistent employment persistently difficult for [Plaintiff].

(Tr. 319.)

On July 12, 2004, Dr. Bue examined Plaintiff for prostate problems.  (Tr. 382.)  Dr. Bue

found that the prostate was normal although Plaintiff reported symptoms of prostatism, which he

determined could be traced to Plaintiff's diabetes.  (Tr. 382.)  In regard to Plaintiff's neuritis, Dr.

Bue noted that Plaintiff has been unable to tolerate Neurontin and considered giving Plaintiff a trial

of Nortriptyline, but decided to wait to prescribe that drug.  (Tr. 382.)

On August 9, 2004, Plaintiff was examined by Dr. Dorsher.  (Tr. 371.)  Dr. Dorsher

diagnosed Plaintiff with gastric dysmotility and constipation.  (Tr. 371.)  Dr. Dorsher noted

improvement in Plaintiff's condition aided by the Plaintiff taking Zelnorm. (Tr. 371.) Dr. Dorsher identified the cause of chronic constipation as autonomic neuropathy. (Tr. 371.) Dr. Dorsher set forth a medication plan that would allow Plaintiff to continue to experience relief from the chronic constipation. (Tr. 371.)

On November 4, 2004, Plaintiff visited Dr. Bue to have forms completed regarding his disability. (Tr. 388.) Dr. Bue noted that Plaintiff was "having continued difficulty with his peripheral neuritis and intermittent difficulty with the gastroparesis resulting in rather severe constipation." (Tr. 388.) During this meeting, Dr. Bue asked Plaintiff to stop smoking and Plaintiff promised to cease tobacco use. (Tr. 388.)

During the November 4, 2004, visit, Dr. Bue completed a questionnaire on Plaintiff's RFC. (Tr. 354.) Dr. Bue stated his diagnosis as "type 2 diabetes with neuropathy of feet and autonomic neuropathy of [gastrointestinal] track." (Tr. 354.) Dr. Bue stated Plaintiff's prognosis as fair. (Tr. 354.) Dr. Bue indicated that Plaintiff had the following symptoms: fatigue, difficulty walking, episodic vision blurriness, excessive thirst, chest pain, swelling, general malaise, muscle weakness, depression, anxiety, abdominal pain, leg cramping, extremity pain and numbness, frequency of urination, sweating, difficulty thinking, occasional headaches, severe constipation, and acid reflux. (Tr. 354.) Dr. Bue stated that Plaintiff experiences constant pain that would interfere with Plaintiff's attention and concentration, thereby rendering Plaintiff incapable of even low stress jobs. (Tr. 355.) Dr. Bue estimated that, in a competitive work situation, Plaintiff could walk 100 feet without rest or severe pain, sit for no more than 30 minutes at one time, stand for no more than 10 minutes at one time. (Tr. 355.) Furthermore, Plaintiff must have an opportunity to walk every 15 minutes for two minutes, shift positions at will and take unscheduled breaks during an 8-hour day. (Tr. 355.) Dr.

8

Bue indicated that Plaintiff's legs would not need to be elevated during prolonged sitting.  (Tr. 355.)

Dr. Bue indicated the Plaintiff could rarely twist, stoop, crouch, squat, climb stairs and lift anything.

(Tr. 356.)  Dr. Bue recommended Plaintiff avoid all exposure to extreme cold, extreme heat, high

humidity, wetness, and cigarette smoke.  (Tr. 357.)  Dr. Bue stated that Plaintiff is not subject to

good days and bad days because all of his days are bad days.  (Tr. 357.)

On December 21, 2004, Plaintiff was examined by Dr. Xie.  (Tr. 390.)  Dr. Xie noted that

Plaintiff's condition continued to deteriorate.  (Tr. 390.)  Dr. Xie found that Plaintiff has a sensory

loss to prinprick to the upper legs about 10 cm below the knee.  (Tr. 390.)  Dr. Xie refilled a

prescription for the Lidoderm patch because Plaintiff reported mild relief with use of the patches.

(Tr. 391.)  Dr. Xie also put Plaintiff on a new medication called Cymbalta.  (Tr. 391.)

On December 27, 2004, Plaintiff went to the emergency room at St. Cloud Hospital with a

right scrotal caruncle.  (Tr. 418.)  Plaintiff complained of a puss draining from an infection near the

right scrotal region.  (Tr. 418.)   The caruncle was incised and drained.  (Tr. 419, 434.)  The wound

required packing and this had to be changed on a regular basis.  (Tr. 419.)

### C.    Plaintiff's Testimony

Attorney Daniel Rethmeier represented Plaintiff at the hearing before the Administrative

Law Judge.  (Tr. 33.)  Plaintiff testified that he graduated from high school and went straight into

the military.  (Tr. 33.)  He lives with his wife and 16 year old stepson in Saint Cloud, Minnesota.

(Tr. 46.)  Neither Plaintiff nor his wife work outside the home.  (Tr. 46.)  Plaintiff's wife is disabled

due to back pain and receives Social Security Disability.  (Tr. 46, 50.)

Plaintiff testified that his last employment was three days in May 2003 as a forklift operator

at a lumber yard.  (Tr. 35.)  This employment ended due to Plaintiff's inability to complete the

required work.  (Tr. 35.)  Prior to the job at the lumber yard, Plaintiff worked for a couple of months at a  part-time job ensuring that the correct addresses were put on direct marketing materials.  (Tr. 36-39.)  This employment ended in late 2002 because Plaintiff stopped receiving hours.  (Tr. 37-38.)

He testified that he is currently unable to work because of problems with his feet and stomach.  (Tr. 39.)  He testified that his feet hurt the more he is on them and his stomach is constantly bloating due to his bowels not emptying properly.  (Tr. 39-40.)  Plaintiff testified that he cannot stand in one position and it is difficult for him to walk.  (Tr. 39.)   Plaintiff testified that he also experiences pain, numbness, and burning while sitting and laying.  (Tr. 39.)  Plaintiff testified that the pain makes it so he can only stand for five minutes at a time, walk for five minutes at a time, sit for a half hour at a time.  (Tr. 40.)  During the hearing, the ALJ offered Plaintiff the opportunity to move around as needed, but he stated that he would be able to manage without moving around.  (Tr. 40.)

Plaintiff testified that constant pain from severe bloating prevents him from working.  (Tr. 41.)  He must move his bowels in order to relieve the pain, which requires two to three long visits, approximately an hour, to the restroom and several short visits in between.  (Tr. 41.)  Plaintiff testified that he is unable to take medications to relieve the pain in his feet because they exacerbate the problem with his stomach. (Tr. 41.) Furthermore, Plaintiff experiences increased pain in his feet because it is uncomfortable to sit on the toilet for extended period of time.  (Tr. 42.)  Plaintiff stated that the bloating prevented him from working because the pain rendered him unable to concentrate.  (Tr. 42.)

Plaintiff testified that he is unable to take pain medication because they cause him to become severely constipated.  (Tr. 43.)  He had tried both Neurontin and Nortriptyline for the peripheral

neuropathy, but had to cease taking these drugs because they would cause constipation, even when he took them in combination with laxatives.  (Tr. 43.)  Plaintiff testified that he places Lidoderm patches on the top and bottom of his feet and they help with the burning in his feet.  (Tr. 43-44.)  Plaintiff testified that he also takes blood pressure medication, high cholesterol medication, Zelnorm and Metroclopramide for autonomic neuropathy, and a generic form of Prilosec to alleviate stomach problems caused by all of his medications.  (Tr. 44.)

Plaintiff also testified that he had recently had a fungus infection on his testicle that had to be removed.  (Tr. 44-45.)  He indicated that his doctor told him that this skin condition is likely attributable to his diabetes and it is possible that he may experience skin conditions in the future.  (Tr. 45.)

Plaintiff testified that he is not limited in grooming activities other than he must use caution not to burn himself in the shower because he has limited sensory abilities.  (Tr. 46.)  Plaintiff occasionally requires assistance from his wife in putting on his socks because his feet are too painful to touch and he does not like to inflict pain upon himself.  (Tr. 46-47.)  Plaintiff testified that his cooking is limited to making toast or cereal because he is unable to stand long enough to cook.  (Tr. 47-48.)  Plaintiff relies on his wife to do the cooking.  (Tr. 47)  Plaintiff is also unable to perform household chores because he cannot stand long enough to perform the chores.  (Tr. 48.)  Plaintiff stated that "[m]y wife takes the brunt of the stuff and my stepson."  (Tr. 48.)  Plaintiff testified that his wife does the grocery shopping because he is unable to be on his feet and his stepson carries the groceries.  (Tr. 49.)  However, Plaintiff's stepson has been recently incarcerated, which has required Plaintiff's wife to carry the groceries into the house.  (Tr. 50.)  The incarceration of Plaintiff's stepson has also created uncertainty as to how snow will be shoveled because both Plaintiff and his

wife are unable to shovel.  (Tr. 51.)

Plaintiff testified that he knows how to drive, but does not drive the car because the shooting pains in his feet make it unsafe to drive.  (Tr. 49.)  He testified that his driving has been restricted to times of absolute necessity, such as when his wife had to be driven to the hospital for a surgery. (Tr. 49.)  Consequently, Plaintiff's wife and stepson do the driving.  (Tr. 49.)

Upon examination by his counsel, Plaintiff testified that he frequently uses a cane because it assists him in maintaining his balance.  (Tr. 53.)  The cane has not been prescribed by a doctor. (Tr. 53.)  He stated that the cane does not impact the distance he is able to walk.  (Tr. 53.)  He testified that sometimes he experiences a sharp pain through his heels that forces him to the ground. (Tr. 56.)

Plaintiff described his average day as consisting of checking his e-mail, talking to his wife, and watching television.  (Tr. 54.)  During these activities, he spends about half of the time with his feet elevated, which primarily relieves his stomach.  (Tr. 55.)

Upon examination by the medical expert, Dr. Steiner, Plaintiff testified that he has been asked to stop smoking by his doctors, but has not stopped.  (Tr. 62.)  Plaintiff also testified that taking Metroclopramide and Zelnorm has helped him a lot.  (Tr. 62.)  These drugs have made it no longer necessary to go to the emergency room.  (Tr. 62.)

**D.      Plaintiff's Wife's Testimony**

Plaintiff's wife, Christine Webb, testified at the hearing on this matter.  (Tr. 57-61.)  She testified that Plaintiff spends most of his day shifting from the couch to recliner to computer chair while watching television and checking e-mail.  (Tr. 58.)  She testified that Plaintiff is in such extreme pain that he changes color, cries, and involuntarily jumps during the night.  (Tr. 58.)  She

testified that she has had to help Plaintiff put on his pants, socks, and shoes, due to the pain Plaintiff experiences. (Tr. 59.) She has also had to help him get to the bathroom because he has been in so much pain that he is unable to walk. (Tr. 59.)

Plaintiff's wife testified that Plaintiff's impairments restrict his ability to concentrate. (Tr. 59.) She testified that the pain is so intense he is unable to concentrate long enough to watch a movie on television. (Tr. 60.)

### E.    Medical Expert's Testimony

The ME, Dr. Steiner, testified that Plaintiff has been diagnosed with diabetes with peripheral and autonomic neuropathy. (Tr. 63.) The ME testified that he did not believe that the Plaintiff suffered from any impairment or combination of impairments that meets or medically equals any of the listings. (Tr. 63-64.) In reaching that opinion, the ME considered whether the peripheral and autonomic neuropathy, when taken together, would equal listing 9.08. (Tr. 65.) The ME stated that the effects of autonomic neuropathy are insufficient to overcome a lack of gait disturbances. (Tr. 66.) He testified that Plaintiff's "time on [his] feet would be limited, perhaps four out of eight [hours in a workday] with an ability to change positions, perhaps half hourly." (Tr. 64.) The ME also opined that Plaintiff would be limited to only occasional use of foot pedals. (Tr. 64.) The ME found no support for Plaintiff's claim that he is on the toilet for an hour, two to three times a day. (Tr. 64.)

### F.    Vocational Expert's testimony

The VE, Mr. Onken, testified regarding Plaintiff's ability to return to his previous work or perform other work existing in the national economy. The ALJ inquired about the availability of work for a person of Plaintiff's age, education, and experience, impaired by diabetes with peripheral and automatic neuropathy and limitations of lifting 20 pounds occasionally, 10 pounds frequently,

standing or walking for no more than four hours in an eight hour day, changing positions every 30 minutes and no ability to operate foot pedals.  (Tr. 71.)  The VE testified that employment existed for such a hypothetical person.  (Tr. 71.)  This work included cashier II positions, gate guard positions, and hand packer and packagers positions, which all exist in the regional economy.  (Tr. 71-72.)  The ALJ added the limitation of using a cane and the VE testified that did not change the available jobs.  (Tr. 72.)  Then the ALJ added the limitation of being absent for an hour at a time up to three times a day and the VE testified that would not be consistent with these types of employment.  (Tr. 72-73.)  Plaintiff's counsel posited a hypothetical person that require elevation of his feet and the ALJ testified if the elevation was only over the knee level then the number of cashier II positions would be reduced, but if the elevation was over the heart, then all jobs would be eliminated.  (Tr. 74-75.)

G.    **The ALJ's Decision**

In determining whether Plaintiff was disabled, the ALJ followed the five-step sequential process outlined at 20 C.F.R § 404.1520.  (Tr. 20.)  In the first step of the analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of his disability.  (Tr. 20.)  In making this determination, the ALJ concluded that Plaintiff's brief employment as a forklift operator at a lumber year did not constitute substantial gainful employment.  (Tr. 20.)  The next step in the sequential evaluation is to determine whether or not Plaintiff had a severe impairment, defined as an impairment that significantly limits the individual's physical or mental ability to meet the basic demands of work activity.  (Tr. 20.)  The ALJ found that Plaintiff was severely impaired by diabetes with autonomic and peripherial neuropathy.  (Tr. 21.)  The ALJ found that Plaintiff's other medical conditions, such as hepatitis B, hypertension, hyperlipidemia,

back pain, and skin conditions did not constitute a severe impairment. (Tr. 21-22.) The regulations next require a comparison of the Plaintiff's severe impairment with the impairments listed in Appendix 1, Subpart P, Regulations No. 4, Listing of Impairments. Based on a review of the evidence and the testimony of the ME, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in listing 9.08 for diabetes or any of the 5.00 listings for digestive disorders. (Tr. 22.) The ALJ concluded that Plaintiff's lack of difficulties with movement or gait disturbances prevented a finding that Plaintiff's impairments met or equaled the criteria for listing 9.08. (Tr. 22.) The ALJ found that Plaintiff's stomach problems were secondary to diabetes and failed to meet or equal the criteria for the 5.00 listings. (Tr. 22.)

The last two steps in the evaluation require the ALJ to determine whether the claimant has the residual functional capacity (RFC) to perform his past relevant work, or lastly, any other work existing in significant numbers in the national economy. (Tr. 22.) In determining Plaintiff's residual functional capacity, the ALJ considered the medical record, the vocational expert's testimony, Plaintiff's testimony, Plaintiff's wife's testimony, and the credibility of Plaintiff's subjective complaints in accordance with 20 C.F.R. § 404.1529 and *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). The ALJ found the Plaintiff credible to the extent he would experience some discomfort with foot pedal operations and prolonged periods of standing and walking. (Tr. 23.) The ALJ did not find Plaintiff credible in his claims that he is incapable of all work at any exertional level. (Tr. 23.) The ALJ assigned little credibility to his testimony as he described limitations that are not found within the medical record. (Tr. 26.) The ALJ concluded that claims of total disability are inconsistent with the objective medical evidence and medical records from treating physicians Dr. Xie, Dr. Sahlstrom, and Dr. Dorsher. (Tr. 23-25.) The ALJ assigned little weight to the opinion

15

of Dr. Bue as his opinions were based upon the Plaintiff's self-reporting rather than objective medical evidence. (Tr. 25.) In particular, the ALJ found that Dr. Bue's responses to the questionnaire on Plaintiff's RFC were without basis in any of his previous medical notes or records. (Tr. 25) The ALJ assigned little credibility to the testimony of the Plaintiff's wife as she described limitations of the Plaintiff that are not found anywhere else in the medical record. (Tr. 26.) The ALJ also considered the consultative examinations by the state agency medical consultants, but placed limited weight on these findings as additional medical evidence was submitted after they had an opportunity to review the record. (Tr. 26.) Based on the evidence, the ALJ determined that Plaintiff had the RFC to: lift 20 pounds occasionally and 10 pounds frequently; stand or walk 4 hours of an 8 hour day; ability to change position every 30 minutes; and no operation of foot pedals. (Tr. 26.) With this RFC and the testimony of the VE, the ALJ concluded that Plaintiff could not perform his past relevant work. (Tr. 27.) The vocational expert testified that Plaintiff was capable of jobs such as cashier II, gate guard, or hand-packers/packagers, which exist within the regional economy. (Tr. 27.) Therefore the ALJ concluded that Plaintiff did not meet the relevant statutory criteria for a finding of disability at any time through the date of this decision. (Tr. 27.)

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole. *See* 42 U.S.C. § 405(g); *see also Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir.1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir.1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir.1989). Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401

16

(1971) (quoting *Consolidated Edison Co., v. NLRB*, 305 U.S. 197, 220 (1938)).   In determining

whether evidence is substantial, a court must also consider whatever is in the record that fairly

detracts from its weight.   *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir.1999); *see also*

*Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989) (citing *Universal Camera Corp. v. N.L.R.B.*,

340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have

supported an opposite decision.   *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir.2000); *see also*

*Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir.1996).   "As long as substantial evidence in the record

supports the Commissioner's decision, we may not reverse it because substantial evidence exists in

the record that would have supported a contrary outcome . . . or because we would have decided the

case differently."   *Roberts v. Apfel*, 22 F.3d at 468. (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th

Cir.2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir.1993)).   "Substantial evidence is less than

a preponderance, but is enough that a reasonable mind would find it adequate to support the

Commissioner's conclusion."   *Id*.   Therefore, our review of the ALJ's factual determinations is

deferential, and we neither re-weigh the evidence, nor review the factual record de novo.   *See Flynn*

*v. Chater*, 107 F.3d 617, 620 (8th Cir.1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir.1996).   The

Court must "defer heavily to the findings and conclusions of the SSA."   *Howard v. Massanari*, 255

F.3d 577, 581 (8th Cir.2001).

Disability is defined as "the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months."   20

C.F.R. § 404.1505(a).   In making the disability determination the Secretary promulgated a sequential

17

evaluation process which applies to both physical and mental disorders. 20 C.F.R. §404.1520 outlines the five-step sequential process used by the ALJ to determine whether a claimant is disabled. The disability determination requires a step-by-step analysis. *See* 20 C.F.R. §404.1520(a). At the first step, the ALJ must consider Plaintiff's work history. At the second step, the ALJ must consider the medical severity of Plaintiff's impairments. At the third step, the ALJ must consider whether Plaintiff has an impairment or impairments that meet or equals one of the listings in Appendix 1 to Subpart P of the regulations. *See* 20 C.F.R. 404.1520(d). If Plaintiff's impairment does not meet or equal one of the listings in Appendix 1, then the ALJ must make an assessment of Plaintiff's residual functional capacity and Plaintiff's past relevant work. If the ALJ determines that the claimant can still perform his or her past relevant work, the ALJ will find that the claimant is not disabled. If the claimant cannot perform his or her past relevant work, then the "burden shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir.2000).

## IV. CONCLUSIONS OF LAW

The four issues that Plaintiff brings this appeal upon are: (1) whether the Plaintiff's combination of impairments is medically equal to a listed impairment; (2) whether the ALJ properly weighed the opinions of Plaintiff's primary care physician, Dr. Bue, in determining Plaintiff's RFC; (3) whether the ALJ properly analyzed the credibility of Plaintiff's subjective complaints of pain and (4) whether the ALJ offered the VE a valid and complete hypothetical.

### A. The ALJ's Determination that Plaintiff's Combination of Impairments Is Not Medically Equal to a Listed Impairment is Supported By Substantial Evidence on the Record as a Whole.

Plaintiff argues that the ALJ erred by not finding that the autonomic and peripheral neuropathy, when taken together, met or equaled Listing 9.08A. Listing 9.08A requires diabetes with neuropathy that results in "sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 9.08A. Plaintiff asserts that his ambulation and time on his feet were reduced by his pain and constipation. Plaintiff claims that neither the ME or the ALJ considered the impact of his pain and constipation on Plaintiff's ability to move.

Plaintiff's argument is not supported by the record. Plaintiff claims that the ME and ALJ did not consider these impairments together. However, Plaintiff's counsel directly asked the ME to consider both autonomic and peripheral neuropathy in determining whether Plaintiff's impairments met or equaled a listed impairment. (Tr. 65.) The ME stated that he had considered these impairments together and determined that they did not reduce Plaintiff's movement in a way that met or equaled Listing 9.08. In finding that the Plaintiff's impairments did not meet or equal a listed impairment, the ALJ relied on the expert opinion of the ME. Therefore, the ALJ's finding the Plaintiff's autonomic and peripheral neuropathy is supported by the substantial evidence in the record.

**B.      The ALJ Properly Weighed the Opinions of Dr. Bue in Determining Plaintiff's RFC.**

Plaintiff argues that the ALJ improperly rejected the opinions of Dr. Bue, Plaintiff's primary care physician. Plaintiff asserts that the ALJ should not have rejected the opinions of Dr. Bue in favor of selected opinions from Dr. Dorcher and Dr. Xie. In her opinion, the ALJ chose to give the opinions of Dr. Bue little weight because she determined that they were based upon Plaintiff's self reporting and not well supported by objective medical evidence.

Generally, a treating physician's opinion is entitled to substantial weight. *See* 20 C.F.R. §

19

404.1527(d)(2).  The opinions of treating physicians, however, do not automatically control in deciding a social security disability claim since the record must be evaluated as a whole.  *See Cruze v. Chater*, 85 F.3d 1320, 1324-1325 (8th Cir. 1996).  In fact, such opinions are only given controlling weight if they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are consistent with other substantial evidence in the record as a whole.  *See* 20 C.F.R. § 404.1527(d)(2); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).  "An ALJ may discount a treating physician's medical opinion, . . . when the treating physician's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole."  *Dornack*, 49 F.Supp.2d at 1142-1143 (citing *Ghant* 930 F.2d at 639; *Kirby v. Sullivan*, 923 F.2d 1323, 1328 (8th Cir. 1991); *Ward v. Heckler*, 786 F.2d 844, 846 (8th Cir. 1986)).

Applying this standard to the facts of Plaintiff's case, it becomes clear that the ALJ assigned appropriate weight to the opinions of Dr. Bue.  Dr. Bue's opinions were unsupported by objective evidence and contrary to the opinions of the specialists treating the Plaintiff.  The ALJ noted that Dr. Bue stated Plaintiff could not stand or walk.  Elsewhere in the record, Dr. Bue stated that Plaintiff could walk 100 feet.  Neither of these statements are supported by any notation by Dr. Bue that he observed the Plaintiff having difficulty standing or walking, instead they are only supported by statements made by the Plaintiff to Dr. Bue.  However, Dr. Bue's statements are contrary to Dr. Xie's observation that Plaintiff's gait is steady.

Dr. Bue stated that he believed that Plaintiff would continue to be resistant to treatment. However, Dr. Dorsher stated that Plaintiff improved with treatment and opined that Plaintiff would continue to improve if he took his medication.  Even Plaintiff testified that his condition improved

while taking Zelnorm and Metroclopramide.

Substantial evidence on the record as a whole supports the ALJ's decision not to give controlling weight to the opinions of Dr. Bue because they are contrary to the opinions of other treating physicians and not supported by objective medical evidence. Many of Dr. Bue's opinions are only supported by unverified claims of the Plaintiff. The record presents numerous inconsistencies, especially between Dr. Bue's findings and the findings of other treating physicians, and reveals no objective evidence that might indicate that the ALJ determination was unreasonable. For the foregoing reasons, the determination of the ALJ is upheld.

### C.    The ALJ Properly Analyzed the Credibility of Plaintiff's Subjective Complaints of Pain.

To assess Plaintiff's credibility, the ALJ had to consider all of the evidence, including prior work records, observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984). The ALJ is required to make an express credibility determination explaining why he did not fully credit Plaintiff's complaints. *See Ghant v. Bowen*, 930 F.2d 633, 637 (8th Cir.1991). The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole. *See Polaski*, 739 F.2d at 1322. Where adequately explained and supported, credibility findings are for the ALJ to make. *See Tang v. Apfel*, 205 F.3d 1084, 1087 (8th Cir.2000).

To guide its analysis, the ALJ must consider all evidence pertaining to Plaintiff's subjective complaints including her prior work record, and physicians' and other third parties' observations relating to such matters as: (1) claimant's daily activities; (2) the duration, frequency, and intensity

of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication, and (5) functional restrictions. *See Polaski*, 739 F.2d at 1322. Another factor to consider while evaluating the credibility of complaints and testimony is whether objective medical evidence that supports the degree of severity of the claimant's alleged subjective pain appears on the record, but the adjudicator is not free to disregard subjective complaints of pain solely because such objective evidence does not fully support them. *See id.*

On appeal, the Court must consider two factors in determining whether a claimant's subjective complaints have been properly assessed by the ALJ using the *Polaski* criteria. First, the Court analyzes whether the ALJ considered all of the evidence relevant to Plaintiff's subjective complaints. *See Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987). Next, the Court considers whether the evidence contradicted Plaintiff's own account of his pain so that the ALJ could discount her testimony for lack of credibility. *See id.*

The ALJ considered all of the evidence relevant to Plaintiff's complaints under the *Polaski* standard and gave specific reasons for discrediting his subjective accounts of pain. The Court must next consider whether the evidence contradicted Plaintiff's subjective accounts of pain so that the ALJ could legitimately discount his testimony for lack of credibility.

The ALJ found Plaintiff's testimony not entirely credible partly on the basis of the scope of his daily activities. "Although daily activities alone do not disprove disability, they are a factor to consider in evaluating subjective complaints of pain." *Wilson v. Chater*, 76 F.3d 238, 241 (8th Cir. 1996). When questioned before the ALJ about his daily activities, Plaintiff responded that he spends an hour at a time, up to three times a day, in the bathroom to move his bowels. The ALJ noted that this was a symptom not appearing at any other place in the medical record. Furthermore,

22

Plaintiff testified that his wife performs all of the household chores because he cannot perform them. However, Plaintiff's wife is currently receiving Social Security Disability for back pain.  Plaintiff also referred to a need to raise his leg constantly throughout the day, however this recommendation is nowhere in the medical record.

In making her determination, the ALJ, applying the applicable *Polaski* standard, properly and specifically identified inconsistencies appearing on the record that undermine Plaintiff's credibility.  The ALJ referred to the *Polaski* considerations and cited inconsistencies in the record to support her finding that Plaintiff's complaints were not fully credible.  The ALJ was not required to discuss methodically each *Polaski* consideration, so long as she acknowledged and examined those considerations before discounting Plaintiff's subjective complaints.  *See Brown v. Chater*, 87 F.3d 963, 966 (8th Cir.1996).  After careful review of the record, the Court concludes that the ALJ's reasoning was adequately explained.  Additionally, the ALJ's finding that Plaintiff's subjective complaints were not fully credible is supported by the record as a whole.

### D.    The ALJ Offered a Valid and Complete Hypothetical In Determining Plaintiff Can Perform Work In The National Economy.

Plaintiff argues that the hypothetical offered to the VE is flawed by improperly discounting the opinions of Dr. Bue and Plaintiff's subjective complaints of pain.  Since the undersigned has determined that the ALJ did not err in affording little weight and credibility to the opinions of Dr. Bue and Plaintiff's subjective complaints of pain, the hypothetical posed by the ALJ is supported by substantial evidence on the record as a whole.  Therefore, the ALJ did not err by relying on the VE testimony regarding the hypothetical she offered.

### V.  RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED**

23

that:

1.    Plaintiff's Motion for Summary Judgment [# 14] be **DENIED**; and

2.    Defendant's Motion for Summary Judgment [# 19] be **GRANTED**.


DATED: February 14, 2008                    _s/ Franklin L. Noel_____
                                             FRANKLIN L. NOEL
                                             United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **March 5, 2008**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.

24